In the Matter of Arbitration between LO-CAL UNION NO. 135 OF the UNITED RUBBER, CORK, LINOLEUM AND PLASTIC WORKERS OF AMERICA, AFL–CIO, Petitioner-Appellee,

and

DUNLOP TIRE AND RUBBER CORPO-RATION OF BUFFALO, NEW YORK, Respondent-Appellant.

No. 311, Docket 31847.

United States Court of Appeals Second Circuit.

Argued Jan. 22, 1968.

Decided March 20, 1968.

Caesar J. Naples, Buffalo, N. Y. (James F. Forton, and Moot, Sprague, Marcy, Landy & Fernbach, Buffalo, N. Y., on the brief), for petitioner-appellee.

Francis V. Cole, Buffalo, N. Y. (John F. Donovan, and Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., on the brief), for respondent-appellant.

Before MEDINA, MOORE and ANDERSON, Circuit Judges.

MEDINA, Circuit Judge.

Claiming that the Arbitrator had exceeded his powers as defined in a collective bargaining agreement, the Dunlop Tire and Rubber Corporation of Buffalo, New York, challenges on this appeal three arbitration awards, each of which has been confirmed by Judge Henderson. We hold that the awards were made in the exercise of the authority of the Arbitrator to pass upon questions relating to the "meaning, interpretation, scope, or application" of certain provisions of the agreement with Local 135 of the United Rubber, Cork, Linoleum and Plastic

Workers of America, AFL-CIO, and we affirm.

The collective bargaining agreement is a lengthy document of some 100 pages printed in small type. It is obviously intended to cover every conceivable sort of dispute or controversy likely to arise between the company and the union or any of the individual members of the union. There is ample internal evidence in the record before us to warrant the inference that William W. Waite, selected by mutual consent as the Arbitrator, was intimately familiar with the workings of the entire plant at Buffalo and also with the interrelation of the various terms of this intricate and comprehensive contract. It is also apparent that Mr. Waite performed his duties as Arbitrator with complete impartiality and dedication to the development and consideration of even the smallest details of the facts involved in the various disputes and to the interests of both the company and the union. The agreement contained a "no strike," "no lockout" and "non-liability" clause.

While the awards now challenged (Grievances .#2, #42 and #43) were made in separate opinions after separate hearings, we shall treat the two opinions and the findings and discussion together as the second opinion contains relevant cross-references to the first opinion and, so far as concerns the awards in question, the subject matter is substantially the same. As we shall see, each of these disputes arose out of the decision by the company in 1964 "to expand and modernize the tread extrusion department in a program costing between one and two million dollars."

The pertinent provisions of the agreement relating to the handling of grievances are set forth in the footnote below.[1] Section 9.10 of the collective bargaining agreement, which lies at the center of the issues on this appeal, provides:

*Section 9.10—Outside Contractors*

(A) While in general, it is the policy and intent of the Company to have that work performed by its maintenance employees which they are able to handle, it is recognized by both parties that at various times, the Company may be required to allot to outside contractors work of a similar or identical nature as that performed by Company Maintenance employees. Such allotment of contracts shall be governed by the following:

(1) That the work project is of such size or nature as to make it impractical to be handled by the above mentioned employees in conjunction with their regular work assignments or

(2) That the work is of such urgency or short duration as to make it impractical to add additional men to the regular maintenance force.

The above is the stated policy of the Company.

(B) In furtherance of carrying out the intent of this policy, it is agreed that if it is necessary to have work done by contractors, the

1. *Section 4.03—Grievance Procedure*

(A) A grievance is a complaint, dispute, or controversy in which it is claimed that the Company has failed to comply with an obligation assumed by it under the terms of this Agreement, and which involves either (1) a dispute as to the facts involved, (2) a question concerning the meaning, interpretation, scope, or application of this Agreement, or (3) both.

*Section 4.04—Arbitration Procedure*

(A) Specifically the question of a general plant-wide wage adjustment and the labor grade wage structure cannot be submitted to arbitration and are not within the powers of an arbitrator under this Agreement.
* * *

(G) It is understood and agreed that the arbitrator shall have no right or power to add to or subtract from or to change the terms of this Agreement or the supplements thereto and that the arbitrator shall have no right or power to disregard any of the express provisions of this Agreement or supplements thereto.

Union Division Chairman will be notified, verbally and in writing, and the matter will be discussed in order to reach a mutually satisfactory conclusion before an agreement is signed for this outside contract work.

In connection with the expansion and modernization of the tread extrusion department, seven grievances were before the Arbitrator for decision. We shall mention them in the order in which they were disposed of by the Arbitrator, as follows: (1) an alleged violation of Section 9.10 because the company contracted out the painting of the remodelled building, rather than allowing the regular maintenance force to do the job (Grievance #62); (2) the finishing of sixteen mill pipe supports, which was done in an outside shop (Grievance #68); (3) several electrical control boxes were moved temporarily while a new concrete block wall was built and new, larger boxes installed. Company employees made the move and made temporary connections. Later, the contractor's employees made permanent connections to the new boxes during a week-end shutdown of the plant (Grievance #1); (4) the company sold some obsolete equipment on an "as is and where is" basis. This equipment was still in the shop when the purchaser's employees entered the plant and removed it. The union interpreted this as a violation of Section 9.10 because Dunlop employees could have moved the machines to the yard to be picked up by the purchaser (Grievance #2); (5) the company had a number of truck tire carriers fabricated by an outside contractor instead of by company welders (Grievance #41); (6) the removal of a bridge crane in Department 214 by non-employees (Grievance #42); and (7) the removal of a spreading machine in Department 202 (Grievance #43).

In disposing of these Grievances the first thing the Arbitrator did was to decide that the underlying purpose of Section 9.10 was "to conserve available workloads for the company's regular employees, to avoid layoffs and short-timing, and to afford overtime earnings opportunities whenever possible." Thus he denied Grievance #62 relating to the painting of the entire remodelled building, because the job was so large that it would hardly have been legally or physically possible for the men to do the work in addition to their heavy regular workload, and even more impossible to do it within the time limits imposed by the schedule for the entire project. Grievance #68 was also denied because the rough castings had been sent to the plant by mistake. Several new mills were being installed and ordinarily the mill manufacturer buys rough castings from a supplier and finishes them in its own machine shop. Because the pipe supports were included in the price of the mills the company sent those in dispute to the mill manufacturer for machining. However, it was agreed that for replacements the company would buy only rough castings and machine them in the company's own shop. As the purpose of Section 9.10 was "to enhance the earnings opportunities of company employees in all possible ways, as well as to improve job security," and the work was such that the maintenance employees were able to handle it, Grievance #1, relating to connecting up the new electrical control boxes, was granted.

It is against this background that the Arbitrator approached Grievance #2, about the removal of the obsolete equipment sold by the company on a "as is and where is" basis, that is one of the three Grievances involved on this appeal. He had already decided the purpose of Section 9.10 and he readily concluded, on the evidence before him, that the removal of this equipment was "work which the regular maintenance employees were able to handle." But, is this contract of sale "the kind of contract envisioned by Section 9.10"? He decided it was, as "this section requires the company to be zealous in protecting the earnings opportunities of its regular employees." This is the crux of the difference between appellant and Judge Henderson.

The answer, of course, is that it would not help appellant even if we were to say that a court construing the collective bargaining agreement would be required as a matter of law to hold that appellant's construction of Section 9.10 is correct. What the parties bargained for and agreed upon was the judgment, not of a court of law or equity, but the judgment of the Arbitrator in all matters concerning "the meaning, interpretation, scope or application" of the agreement, including Section 9.10 thereof. Accordingly, the Arbitrator in no sense exceeded his authority when he interpreted Section 9.10 in the manner above described and held that "the men who would have worked at moving the machines to the point of pick-up by the purchaser should be paid the amount they would have earned had they performed the work."

It is curious that such misunderstanding should persist on the subject of the powers of the Arbitrator under this standard form of collective bargaining agreement after the Supreme Court has spoken so plainly. Thus, in United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960), Mr. Justice Douglas wrote for the Court:

> As we there emphasized, the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

Similarly, in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584–585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960), Mr. Justice Douglas again wrote:

> In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.

In this case we have quoted in the early part of this opinion the only express provision in the agreement excluding a particular question from arbitration and that had no reference to Section 9.10.

The nub of the matter is that these labor contracts are *sui generis*. Arbitration is itself a part of the collective bargaining process. The labor arbitrator is chosen because the parties presumably believe he has special knowledge of "the common law of the shop" and an ability to weigh such considerations as "the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished." No judge or aggregation of judges can do this.

Grievance #41 was denied for the same reasons given for the denial of Grievance #68. The remaining two, Grievances #42 and #43, which constitute the second and third disputes involved on this appeal, are simply variations of Grievance #2, which we have discussed above in some detail. The principles applied by the Arbitrator were the same, and so was his interpretation of what was a "contract" under the provisions of Section 9.10.

Affirmed.

MOORE, Circuit Judge (concurring):

I concur in the result. However, it should be emphasized that the arbitrator derives his authority only from the contract. Admittedly, when the parties have contractually ceded authority to construct the agreement to an arbitrator, unless his "words manifest an infidelity to this

obligation." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1361 (1960), the courts should not overrule him. However, the arbitrator's decision that he has the authority to render a given award is always subject to meaningful review. Torrington Company v. Metal Products Workers Union Local 1645, 362 F.2d 677, 680 (2 Cir. 1966). Here, the arbitrator did not exceed the authority transferred to him in the collective bargaining agreement.